UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRISTAL NARKIEWICZ, : | |
|           Plaintiff, : | |
| : | |
| v. : | No. 5:20-cv-05682 |
| : | |
| MANHEIM TOWNSHIP, : | |
|           Defendant. : | |

**O P I N I O N**
Defendant's Motion for Summary Judgment, ECF No. 28 – Granted

**Joseph F. Leeson, Jr.**                                                                               January 18, 2022
**United States District Judge**

**I.    INTRODUCTION**

Plaintiff Kristal Narkiewicz claims her former employer, Defendant Manheim Township, violated her due process rights by creating a false, defamatory impression of her in connection with her termination and not providing a name-clearing hearing.  The Township has filed a Motion for Summary Judgment asserting its entitlement to judgment, arguing that its statements were not false.  For the reasons set forth below, the Motion is granted.

**II.   UNDISPUTED FACTS**

Narkiewicz was employed as a program facilities manager by Manheim Township from March 2, 2020 to July 21, 2020.  Def.'s Stmt Fact ¶ 7, ECF No. 29; Pl.'s Resp. Def.'s Stmt Fact ¶ 7, ECF No. 33-2.  As facilities manager, Narkiewicz directly supervised two pool managers: one for Overlook Pool and one for Skyline Pool.  *Id.* ¶ 9.  Isabella Drolet, who was hired after Narkiewicz began, was the Skyline pool manager for 2020.  *Id.* ¶ 11.

The Township had a policy regarding appropriate swimming attire. *See id.* ¶¶ 12-15. Narkiewicz's supervisor approved a sign stating "no cheeky bottoms," which was posted at the entranceway of the pool during the 2020 season. *See id.* ¶¶ 14-15.

On July 3, 2020, Narkiewicz and Drolet approached two young women about their bikini bottoms, which were described as thongs. *See id.* ¶¶ 14-15, 28. The girls agreed to go home and change. *See id.* ¶ 28. When they returned, Garcia, the mother of one of the young girls, was with them. *See id.* ¶ 29. Garcia approached Narkiewicz, yelling that her daughter's suit was not a thong and accusing Narkiewicz of being a racist. *See id.* ¶¶ 31-34. Garcia was aggressive, threatening, and cursing loudly. *Id.* Narkiewicz told Garcia that she was being aggressive and to stop cursing or she would need to leave the pool. *Id.* ¶ 35. Garcia refused to leave. *See id.* ¶¶ 44-46. After speaking with other pool employees, Narkiewicz called the police. *See id.* Two other women yelled that it was a racist pool and Narkiewicz responded that "it had nothing to do with race, she was somebody who was not following our policy." *Id.* ¶ 47. Within hours, the public started calling the Township and making social media posts accusing Narkiewicz of being a racist. *Id.* ¶¶ 53-56.

Matt Stopa, the director of the Recreation and Park Planning Department and Narkiewicz's direct supervisor, was immediately advised of the incident. *See id.* ¶¶ 6, 49. Stopa was supportive of how Narkiewicz handled the incident. *See id.* ¶¶ 50, 58. Stopa posted responses on the Department's Facebook page, denying that the incident had anything to do with race. *Id.* ¶ 57. Stopa's response did not calm the public's accusations and demands that Narkiewicz be fired so the Facebook page was taken down. *Id.* ¶¶ 59-61. Nevertheless, public outrage over the incident and accusations of racism continued, in social media and in news reports. *See id.* ¶¶ 59-77.

On July 8, 2020, the Township's Board President Sam Mecum issued a press release, stating:

> The Manheim Township Board of Commissioners has taken action to investigate the incident which occurred at Skyline Pool on July 3. The Township has a policy prohibiting unlawful discrimination. . . . The Township has an established complaint procedure to ensure that all complaints are thoroughly investigated and appropriate action is taken. We are currently in the process of interviewing witnesses, including residents and pool patrons. The Board cannot comment further while the investigation is pending, but anticipates that the investigation will be completed soon. The Township is also reviewing its current policies on pool attire, rules enforcement, and staff training to evaluate whether changes are needed.

*See* Press Rel., Ex. J, ECF No. 34-10 ("Press Release").

The LNP/Lancaster online published several reports regarding the incident. *See* Def.'s Stmt Fact ¶ 103; Pl.'s Resp. Def.'s Stmt Fact ¶ 103. The first online editorial attributing public statements to the Township was posted on July 8, 2021. *See id.* ¶ 108. This editorial stated that the Manheim Township Board of Commissioners said in a statement on "Sunday," July 5, 2020,[1] that it was "closely investigating the incident . . . [and would] discuss the matter with management, staff, the police, and pool patrons, including those who raised the issue." *See* Art. 1, Ex. I ("Article 1")., ECF No. 34-9; Mecum Dep. 40:19 – 41:1, ECF No. 29-6. A similar article ran the same day, in which it was reported that the Township made a statement on July 5, 2020, that it was investigating the incident. *See* Art. 2, Ex. H ("Article 2"), ECF No. 34-8.

Stopa began looking at other pools the day after the incident to determine what rules existed and to gather ideas of how to make improvements moving forward. *See* Def.'s Stmt Fact ¶¶ 278-279; Pl.'s Resp. Def.'s Stmt Fact ¶¶ 278-279. The Board had an understanding that Stopa would specifically reexamine the swimsuit policy, and it was in fact revised. *Id.* ¶¶ 280-284.

---

[1]   It is unclear whether LNP/Lancaster online incorrectly reported that the Township issued a statement on July 5, 2020, or whether it misquoted the July 8, 2020 press release. However, this distinction is not material to a decision on the summary judgment motion.

The revisions removed the discretionary enforcement from the staff. *Id.* The Township also started discrimination, harassment, and de-escalation trainings, which were not held prior to the incident. *Id.* ¶¶ 286-289.

The Township promptly began an investigation into the incident. *See id.* ¶ 108. On July 20, 2020, Steven Schlegel, the director of human resources, authored a report, entitled "Summary of Investigation." *See id.* ¶¶ 5, 149. Schlegel reviewed some, but not all, Township policies and interviewed some, but not all, witnesses to the incident. *See id.* ¶¶ 150-151. Schlegel compiled information from the interviews, written statements, and document review into his ten-page report, although Narkiewicz contends that he "cherry-picked certain information." *See id.* ¶¶ 152-172. Schlegel concluded, *inter alia*, that Narkiewicz's behavior "escalated the situation as opposed to deescalating it" and therefore violated Pool Public Relations Policy. *Id.* ¶¶ 173, 182. The Report identified what actions Schlegel believed were escalating and why he reached his conclusions. *See id.* ¶¶ 173-196. Narkiewicz contends, however, that Schlegel "cherry-picked certain information" and that his conclusions were not supported by the facts. *See id.* Schlegel recommended the immediate termination of Narkiewicz. *Id.* ¶ 196. The written Report specifically identifies four applicable Township policies, sixteen persons that were contacted for an interview and/or gave written statements, the various documents reviewed, including Narkiewicz's email about feeling threatened, the complaint, social media posts, LNP posts and articles, and the police report. *See* Report, Ex. C to Stopa Dep. October 4, 2021, ECF No. 29-3. The written Report was not disclosed to the public. *See id.* ¶¶ 256-257.

The Board met in executive session on July 20, 2020, concerning, *inter alia*, Schlegel's Report. *See id.* ¶¶ 201, 254. Schlegel prepared Narkiewicz's termination letter with the assistance of labor counsel. *Id.* ¶ 212. The termination letter included the following text:

> As a result of that investigation, the Township has determined that there is probable cause to find that your actions violated the Township's Discrimination and Harassment Free Workplace Policy, the Public Relations Policy, and the Abusive, Threatening and Violent Guests policy…In addition to the incident on July 3, 2020, there have been other recent incidents which demonstrate a pattern of poor decision-making. On June 30, 2020, you failed to follow proper procedure when a lifeguard was injured, and on June 23, 2020, you failed to recognize the seriousness of a breach of procedure by the Overlook Pool Manager when he inappropriately confronted a patron. In light of these incidents, your employment with the Township has been terminated.

*Id.* ¶ 213.  Schlegel gave the termination letter to Narkiewicz on July 21, 2020.  *Id.* ¶ 243.

On or about July 24, 2020, Township Solicitor Dwight Yoder emailed the media regarding Narkiewicz's termination.  *See* Pl.'s Ctr Stmt Facts ¶ 103; Def.'s Resp. Pl.'s Ctr Stmt Facts ¶ 103.  Also on July 24, 2020,[2] the LNP/Lancaster online posted on its Facebook page that Narkiewicz had been terminated.  *See* Art. 3, Ex. D, ECF No. 1-6 ("Article 3").  The post was titled: "Skyline Pool manager fired after calling police on Latino and Black family."  *Id.*  The following day, the LNP/Lancaster online published an article with the same title.  *See* Art. 4, Ex. T, ECF No. 34-20 ("Article 4").  This article quoted Yoder as stating: "Ms. Narkiewicz was terminated from her employment . . . following an investigation conducted through an established procedure by the human resources office."  *Id.*  It was further reported that Yoder stated he could not comment any further beyond confirming the termination because it was a personnel matter and because of pending litigation.  *See id.*

At the Board's regular meeting on July 27, 2020, Board President Sam Mecum announced that "[t]he Board of Commissioners held executive sessions on July 20th and July

---

[2] The timing of Yoder's email on or about July 24, 2020, in relation to the Facebook post of that date is in dispute, but this issue is not material to a decision on the summary judgment motion.

24th to deal with personnel issues and litigation connected with the Skyline Pool incident." *See id.* ¶ 252.

On October 21, 2020, Narkiewicz emailed Stopa and requested a letter of recommendation in connection with her application for a YMCA position. *See id.* ¶ 258. Stopa did not provide the letter. *See id.* ¶¶ 259-260. Two days later, Narkiewicz sent an email to the Township Board, stating, *inter alia*:

> As you know, I am the former Program Facility Manager at Manheim Township. I was terminated on July 21, 2020 when I was presented with a letter from Steven Schlegel, the Township's Human Resources Director. The grounds for termination were not true. I did not have an opportunity to present my side of the story before I was terminated. I did specifically request that opportunity before I was terminated, and then again I asked Mr. Schlegel for an opportunity to clear my name. I was told I would not be afforded that opportunity. My termination was under false pretenses. I did not commit any wrong and I did not violate any rule or policy. My termination has caused me severe harm to my reputation. I am again asking for the Board to reconsider and provide me with a full and fair opportunity to be heard to clear my name within the next seven (7) days. Time is of the essence because my ability to obtain employment in my chosen field has been adversely effected.

*Id.* ¶ 262. Mecum responded in a letter signed on October 28, 2020, but Narkiewicz never saw the letter. *See id.* ¶ 276.

On November 13, 2020, Narkiewicz initiated the above-captioned action alleging that the Township violated her due process rights by not conducting a proper name-clearing hearing despite having created a false impression of her in connection with her termination, which deprived her of her liberty interest in her reputation. She claimed that the Township's statements that she was terminated as a result of an "investigation" conducted according to "established procedures" is false because the investigation was merely a sham and not conducted in accordance with any procedures. *See* Compl. ¶¶ 54-58. Narkiewicz alleged that the Township disseminated information to the public that she was terminated for racist behavior, knowing that to be untrue. *Id.* ¶ 65.

The Township has filed a Motion for Summary Judgment. *See* SJ Mot., ECF No. 28. The matter is fully briefed and ready for disposition. *See* Opp., ECF Nos. 33-34; Reply, ECF No. 37.

## III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must

consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

      **B.**    **Procedural Due Process Claim- Review of Applicable Law**

"[W]hen an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination, "it deprives the employee of a protected liberty interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)). "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (referring to this as the stigma-plus test). "When such a deprivation occurs, the employee is entitled to a name-clearing hearing." *Id.* The purportedly stigmatizing statements must have been (1) false and (2) made publicly. *Id.*

**IV.**    **ANALYSIS**

      The Township has filed a Motion for Summary Judgment arguing that none of its public statements were false. *See* SJ Mot., ECF No. 28. The Township further asserts that any reputational harm to Narkiewicz was not caused by the Township, but by third-party statements in social media and the press. *Id.* In opposition to the Motion, Narkiewicz argues that the Motion for Summary Judgment is an improper motion for reconsideration and that there are genuine issues of material fact as to whether the Township made false statements to the public and whether her reputation was harmed by the same. *See* Opp., ECF No. 33. Narkiewicz urges this Court to not consider the Township's statements in a vacuum and argues that, in light of the media narrative, the Township's statements are false. *See id.* The Township filed a Reply. *See* ECF No. 37.

A.    **The Motion for Summary Judgment is a proper motion.**

Narkiewicz suggests that the Motion for Summary Judgment renews arguments[3] from the Motion to Dismiss that she failed to identify any false statements published by the Township and is therefore an improper request for reconsideration.  Narkiewicz does not cite to any case law to support the contention that a defendant may not seek summary judgment after filing a motion to dismiss,[4] nor do the Rules of Civil Procedure support the argument.  Rather, the fact that different standards of review apply to the two types of motions contradicts her suggestion.  Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).  In contrast, a party opposing summary judgment must go *beyond the pleadings* with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

Moreover, not all of Narkiewicz's factual allegations, which this Court accepted as true and construed in the light most favorable to her when denying the Motion to Dismiss, *see* Order, ECF No. 14, are supported by the evidence.  For example, the Complaint alleged that several days after stories had begun circulating in the media accusing Narkiewicz of being a racist, the "Facebook page for the Recreation Department received comments on this issue *en masse*,

---

[3] Narkiewicz also claims that the Township's summary judgment arguments relating to reputational harm are veiled attempts for reconsideration, but for the reasons set forth herein, there is no need to consider the question of reputational harm because the undisputed facts show that the Township did not publish any false statements.

[4] The one case cited addresses a motion for reconsideration, not a summary judgment motion.  *See* Opp. 5.

leading to a shutdown of the page. . . . Manheim Township immediately took the stance that the situation arose entirely out of Plaintiff's 'discrimination,' without acknowledging that she had been enforcing the Township's policy and without any evidence of discriminatory enforcement of that policy." Compl. ¶¶ 34-37, ECF No. 1.  Contrary to these allegations, the undisputed facts show that Stopa, the director of the Recreation and Park Planning Department and Narkiewicz's direct supervisor, posted a response on the Department's Facebook page denying that the incident had anything to do with race.  *See* Def.'s Stmt Fact ¶ 57; Pl.'s Resp. Def.'s Stmt Fact ¶ 57.  It was only after Stopa's response did not calm the public's defamatory accusations and demands that Narkiewicz be fired that the Facebook page was taken down.  *Id.* ¶¶ 59-61.

The Motion for Summary Judgment is not merely seeking reconsideration and is a proper motion.

    **B.**    **The undisputed facts show that none of the Township's public statements were false.**

To establish a due process claim for deprivation of a liberty interest in reputation, Narkiewicz must show that the Township's statements were (1) false and (2) made publicly. Narkiewicz refers to several public statements by the Township regarding its "investigation" pursuant to an "established procedure" and claims that it intentionally gave the false impression that she engaged in racist behavior by staging an investigation that resulted in a "wildly false and misleading investigative report."  *See* Resp. 10-12.

First, Narkiewicz suggests that the Township falsely stated that she needed training. However, the Township's first public statement about training appeared in a press release issued on July 8, 2020, stating, *inter alia*, that the Township was reviewing its current policies on pool attire, rules enforcement, and staff training to evaluate whether changes are needed.  There is nothing false about this statement, as is evidenced by the Township's next public statement

regarding training.  At a public board meeting on July 13, 2020, the Board voted on Resolution 2020-88, which directed all department heads of Manheim Township to review, evaluate, and update their department's policies to ensure the policies fully and appropriately provide direction to staff when interacting with the public.  Although the Township stated that the need for this Resolution was brought to light due to recent events, it did not state that Narkiewicz needed more training or that she violated policy.  In fact, only days before, the Township had publicly denied on its Facebook page that the incident had anything to do with race.  Further, the Resolution focused on the adequacy/inadequacy of the Township's policies.  The fact that the Resolution followed a reading of the Township's non-discrimination policy does not change the implication or show that the Township created a false inference that it had changed its opinion that the incident did not involve race.  Moreover, the Township's statements about why Resolution 2020-88 was being addressed were not false.

Second, the Township's statements that it was conducting/did conduct an investigation were not false.  Although Narkiewicz challenges the sufficiency of the investigation, the undisputed evidence shows that an investigation did in fact take place.  During this investigation, Schlegel reviewed Township policies, contacted and/or reviewed written statements by sixteen persons, considered various documents, summarized his investigative findings into a written Report, and recommended certain action be taken as a result of his findings.  *See* Report.  Accordingly, the Township's statement that Narkiewicz had been terminated following an investigation was also true.  Despite any impression that the public might have about the results of the investigation and the reason for Narkiewicz's termination, this impression was created, if at all, by the media, not by the Township.  In fact, the Township could not say more about the reason for her termination without revealing that the investigation had concluded Narkiewicz

was at fault in the incident by failing to deescalate the situation. The Township's silence and the fact that the Township did not publicize the investigative Report[5] ensured that it was not responsible for creating a negative impression, especially considering the Township's statements only weeks before denying that the incident had anything to do with race.

For these reasons, Narkiewicz's suggestion that the Township's reference that the investigation would occur pursuant to an established procedure legitimized its action also does not support her claim. Mecum testified that the "established procedure" referred to who would conduct the interview: the human resources director, who did in fact conduct the investigation.

Accordingly, in the absence of any evidence that the Township's public statements were false, Narkiewicz has failed produce evidence to show the existence of every element essential to her case. The Township cannot be held responsible for the negative impression the media created about Narkiewicz. Accordingly, the Township is entitled to summary judgment.

## V.     CONCLUSION

Considering the undisputed evidence, summary judgment is entered in the Township's favor because Narkiewicz has failed produce evidence that would show the Township's purportedly stigmatizing public statements were false.

A separate Order follows.

BY THE COURT:

/s/ Joseph F. Leeson, Jr.
JOSEPH F. LEESON, JR.
United States District Judge

---

[5] Because the Township did not publicize the investigative Report, any challenges to the alleged falsity of statements made therein do not support Narkiewicz's constitutional claim.